UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| ACT FOR HEALTH d/b/a PROFESSIONAL CASE MANAGEMENT, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:12-cv-00442 |
| CASE MANAGEMENT ASSOCIATES, INC. d/b/a FREEDOM CARE, | ) ) ) | Judge Varlan Magistrate Judge Guyton |
| Defendant. | ) ) ) | |

## CASE MANAGEMENT ASSOCIATES, INC.'s RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ACT for Health d/b/a Professional Case Management's ("ACT for Health") flawed Brief in Support of its Motion for Partial Summary Judgment ("Brief") relies upon factual assertions that are either unsupported by the record or contradicted by Greg Austin ("Austin"), ACT for Health's President; omits material facts that undercut its argument; and relies upon authority that is either incomplete, non-binding or distinguishable. These significant shortcomings doom ACT for Health's dispositive motion, meaning its motion for partial summary judgment should be denied.

**A.  ACT for Health's Brief Makes Material Factual Assertions Contradicted by Austin.**

1.  ACT for Health's Brief states "PCM[1] properly applied for and was granted a Certificate of Need and a license pursuant to those rules."[2] (Pltf.'s Br. p. 2.)  It also claims

---

[1] ACT for Health identified itself as "PCM" throughout its Brief.  (Pltf.'s Br. p. 1.)

"[u]nlike PCM, however, Freedom Care has never applied for a license or Certificate of Need. . . . (*Id.* p. .)

2.      ACT for Health further states that "Freedom Care is operating in the same market as PCM" and "PCM has a stake in preventing unlicensed and unregulated entities, such as Freedom Care, from competing unfairly in the very same geographic area in which PCM is providing services." (Pltf.'s Br. p. 16.) Implicit in these statements is the fact that ACT for Health is, and has always been, licensed to provide home health care services in the State of Tennessee.

3.      ACT for Health, according to Austin, and contrary to its Brief, is not licensed to provide medical care within the State of Tennessee. (Austin Dep. 8.) Nor has ACT for Health been granted a CON by the State of Tennessee. (*Id.* 9.)

4.      PCMT, rather than ACT for Health, was awarded a CON by the State of Tennessee's Health Services and Development Agency on or about November 14, 2007. (Austin Dep. 18; Ex. 1 (PCM 000064).) PCMT applied for and received its license to provide health care services shortly thereafter. (*Id.* (PCM 000156).)

5.      PCMT's verified CON application included the following misstatement:

> [o]ne of the reasons the applicant knows there is a need for the services is because in June 2005, the applicant briefly saw 3 patients in Tennessee prior to becoming aware of the requirement of a CON for home health services.

\*          \*          \*

---

[2] ACT for Health did not cite any evidence from the record to support this statement. It did not because it cannot. (Austin Dep. 8-9.) Statements without evidentiary support should not be considered by the Court. *See* Fed R. Civ. P. 56(c)(1)(A) ("a party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers; or other materials). . . .").

(Austin Dep. Ex. 1 (PCM 000075).) ACT for Health, rather than PCMT, was the legal entity that provided the earlier services without a license. (Austin Dep. 9, 26.) PCMT was not formed until August 30, 2006, making it impossible for PCMT to have provided health services in the State of Tennessee prior to the submission of the CON Application. (*Id.* 19; Ex. 1 (PCM 000103).)

## B. ACT for Health's Brief Ignored Material Facts that Undercut Its Argument.

### i. ACT for Health's Dispositive Motion Is Not Its First Attempt to Close Freedom Care's Doors.

6.       On or about May 2, 2012, approximately 3.5 months before ACT for Health filed the pending action, PCMT officials attended a Tennessee Department of Health hearing to complain that Freedom Care and other home health providers were providing services in and around Oak Ridge without a license. (Austin Dep. 145-46.) Austin, ACT for Health's President, and Kim L. Looney ("Looney"), an attorney who represents PCMT, attended the meeting on behalf of PCMT and spoke in support of PCMT's complaint against Freedom Care and other health care providers. (*Id.* 3, 145-47.) At no time during their presentation did either Austin or Looney advise the Tennessee Department of Health's Board that PCMT's CON Application acknowledged that patient services could be provided by a non-licensed health services provider pursuant to an agreement with a licensed home health care company. (*Id.* 149.) Nor did Austin and Looney advise the Tennessee Department of Health that Freedom Care was providing its services in connection with an Agreement with Jellico Hospital, a licensed home health care provider. (*Id.* 148; Garner Dep. Ex. 33.)

7.       Austin testified that he does not know what action, if any, the Tennessee Department of Health has taken in connection with PCMT's complaint. (Austin Dep. 149.)

3

PCMT has not taken any follow-up action relating to PCMT's complaint since the May 2, 2012 Tennessee Department of Health meeting.[3] (Austin 149-51.)

8.      Looney took subsequent action, however, and provided Austin with a copy of her July 31, 2012 letter to the State of Tennessee's Director of Licensure.[4] (PCM 003627-48.) In her letter, Looney claimed "that these unlicensed entities [Critical Nurse Staffing and Freedom Care] are billing and receiving payment from the EEOICPA for their services – is crucial as it confirms that these entities are acting as Home Care Organizations in Tennessee." (PCM 003628.) This representation, however, is incorrect. (Garner 2nd Aff. ¶ 3.) The evidence is undisputed that the DOL makes payments to Jellico Hospital for the care provided to the DOL patients for which Jellico Hospital is responsible. (*Id.*)

9.      Looney's letter indicates her firm represented "Professional Case Management" in connection with the complaint against Freedom Care. (PCM 003627.) She does not, however, state whether she is representing ACT for Health or PCMT. (*Id.*) At no time does Looney's letter advise the State of Tennessee that ACT for Health's nurses are providing services within the State pursuant to a lease agreement between ACT for Health and PCMT. (*Id.*) It is almost certain this omission was intentional because it would have completely undermined ACT for Health's argument had it been exposed.

10.      The Tennessee Department of Health has not taken any action against Freedom Care since PCMT's May 2012 complaint. (Garner Aff. ¶ 7.)

11.      The Tennessee Department of Health has investigative powers. *See* Tenn. Ann. § 68-11-214. It also has the authority "to initiate proceedings seeking injunctive relief and

---

[3] Austin also testified that Looney has not taken any follow-up action relating to PCMT's complaint since the May 2, 2012 meeting. (Austin Dep. 149-51.) For the reasons that follow, Austin's testimony is mistaken.
[4] These documents were not produced by ACT for Health until August 21, 2013, despite being requested by Freedom Care on or about February 7, 2013.

4

any other form of relief available in law or equity against any person who owns, operates, manages or participates in the operation of or management of any facilities required to be licensed under this part, or any resident or residents in any facility required to be licensed under this part, without having the license required by this part." Tenn. Code Ann. § 68-11-213(a)(1).

### ii. PCMT's CON Application Included a Verified Statement that Recognized an Agreement Like the One between Jellico Hospital and Freedom Care.

12. PCMT's verified CON Application included the following statement:

[w]hile it might be possible for the applicant to joint venture with an existing home health agency in the service area to provide the services, that option would likely increase costs and decrease efficiency . . . . Professional Case Management would also incur additional costs indentifying a joint venture partner and coming to an agreement for the provision of services, making a joint venture a more costly alternative.

(Austin Dep. Ex. 1 (PCM 000095).).

13. Before including this language in PCMT's CON Application, PCMT officials discussed the possibility of pursuing a joint venture with a licensed health services provider, rather than requesting a CON from the State of Tennessee. (Austin Dep. 164.) One factor in PCMT's decision to submit a CON Application, rather than partner with a licensed entity, was the fact the go-it-alone approach allowed PCMT to avoid sharing profits with a business partner. (Austin Dep. 156-57.)

### iii. Like Freedom Care, ACT for Health's Nurses Provide In-Home Services in Tennessee Despite the Fact It Lacks a License.

14. ACT for Health employees provide in-home services to PCMT patients pursuant to "an employee lease agreement between" PCMT and ACT for Health. (Austin Dep. 15.) Austin described the arrangement as follows:

Q: Is my understanding correct that all the employees who are providing services in the State of Tennessee are employed by ACT for Health, Incorporated?

5

\*     \*     \*

A:    That's where their paychecks come from, although between the lease agreement between Professional Case Management of Tennessee and ACT for Health, I guess I'm not clear on the legal distinction of who their employer is, but the paychecks would come from ACT for Health.

Q:    Who pays their Social Security contribution?

A.    As a payroll deduction, that would come out of Act for Health.

\*     \*     \*

Q:    And there's an agreement in place between Professional Case Management of Tennessee and ACT for Health in which Professional Case Management leases the employees from ACT for Health?

A:    That's correct.

Q:    And included in the employees that Professional Case Management of Tennessee leases from ACT for Health are those who provide medical services.

\*     \*     \*

A:    That's correct.

(Austin Dep. 16-17.)

15.    The number of ACT for Health employees providing services in Tennessee has increased significantly since 2008. In 2008, ACT for Health leased fewer than 100 employees to PCMT. (Austin Dep. 27.) ACT for Health currently employs approximately 200 to 250 employees, who are providing medical services in Tennessee under the lease agreement.[5] (*Id.* 26-27.)

---

[5] The number of patients served by PCMT has increased dramatically over that same period of time. In 2008, PCMT provided services to approximately 50 to 75 patients. (*Id.* 26.) It currently provides treatment to "somewhere between 115 and 125" patients. (*Id. 26.*)

6

### iv. Jellico Community Hospital, Inc. Is Responsible for the Patients Treated By Freedom Care.

16.     By outlining the services and functions for which Freedom Care is responsible, ACT for Health attempted to create the impression that Jellico Community Hospital, Inc. ("Jellico Hospital") serves no meaningful role under the Personal Services Agreement ("Agreement") between Freedom Care and Jellico Hospital. (Pltf.'s Br. 5-6.) ACT for Health even argues that "Jellico [Hospital] does not oversee Freedom Care's day-to-day operations in a meaningful way." (*Id.* 6.)

17.     The uncontroverted facts are to the contrary. Pam Hamman ("Hamman") testified as follows:

Q:     And as I understand it, Ms. Hill, as the designated employee, makes supervisory visits with clients seen by Freedom Care employees and meets with Freedom Care administrative staff to discuss patient care; is that correct?[6]

A:     That's correct.

(Hamman Dep. 20-21.)

18.     It is undisputed that Lisa Hill ("Hill"), a nurse at Jellico Hospital, visits patients cared for by Freedom Care "at least monthly to ascertain whether the care provided by Freedom Care is appropriate." (*Id.* 23-24.) Hill is able to make this determination by observation and assessment of the United States Department of Labor ("DOL") patients and speaking with either the DOL patients or the Freedom Care caregivers. (*Id.* 28.) Hill records supervisory notes relating to her visit with each DOL patient, which are maintained by Jellico Hospital. (*Id.* 31.) Hill attends meetings with Hamman at which the DOL patients and their care are discussed. (*Id.* 23.) Hill also visits Freedom Care's office every two weeks for the purpose

---

[6] ACT for Health's argument notwithstanding, its counsel recognized the supervisory nature of the relationship between Jellico Hospital and Freedom Care during Hamman's deposition. (Hamman Dep. 20-21.)

of obtaining updated medical records relating to the DOL patients and participating in a case conference with Freedom Care personnel.[7]  (*Id.* 33.)  None of these facts were acknowledged by ACT for Health in its Brief.

19.     Jellico Hospital is responsible for each patient that is cared for by Freedom Care pursuant to the Agreement.  (Garner 2nd Aff. ¶ 3.)  The DOL pays Jellico Hospital, rather than Freedom Care, for the services provided to the DOL patients for which Jellico Hospital is responsible.  (*Id.*)  Thereafter, Jellico Hospital pays Freedom Care for the services Freedom Care provides to Jellico Hospital's DOL patients.  (*Id.*)  The portion of the DOL payment retained by Jellico Hospital relates to the supervision provided by Hill and the administrative services performed by Jellico Hospital.  (*Id.*)   The agreed upon payment schedule was approved by the accounting and legal departments that reviewed the agreement for Jellico Hospital.  (*Id.*)   Jellico Hospital maintains all records relating to each DOL patient, including those records created by Hill during the course of her supervisory activities.  (*Id.*)

### v.     Freedom Care's Services Are Provided by Licenses Professionals.

20.     The services provided by Freedom Care under its Agreement with Jellico Hospital are performed by nurses who are licensed by the State of Tennessee. (Garner 2nd Aff. ¶ 4.)

### vi.     ACT for Health Fails to Offer Any Evidence Relating to the Two Patients It Claims Are Now Treated by Freedom Care.

21.     ACT for Health states that "[s]ince Freedom Care began providing in-home skilled nursing care pursuant to the Agreement with Jellico, Freedom Care is now serving at least two patients who had been receiving care from PCM." (Pltf.'s Br. p. 7.)  However, no

---

[7] A case conference involves "discussing the clients, their needs, whether those needs are being met. . . . [whether] there were any other services that needed to be provided to that client." (Hamman Dep. 33-34.)  Notes relating to the case conferences are recorded by Hill and maintained by Jellico Hospital. (*Id.* 34-35.)

evidence was offered regarding the circumstances under which each patient came under the care of Freedom Care in accordance with its Agreement with Jellico Hospital. (*Id.*) Because ACT for Health is not licensed and provided these services pursuant to its lease agreement with PCMT, ACT for Health had the same relationship with those patients as does Freedom Care, which is providing the services in accordance with its Agreement with Jellico Hospital. (Austin. Dep. 8-9.)

22.    The explanation for ACT for Health's omission is simple. Both patients switched providers for legitimate reasons. In fact, one patient changed providers only after being discharged by PCMT. (C. Williams Aff. ¶ 7-10.)

23.    PCMT treated Patient A, using Act for Health Nurses, for approximately 18 months. (Austin Dep. 55-56.) At no time during this 18-month period did the DOL authorize the treatment provided by PCMT.[8] (*Id.*)

24.    On June 13, 2012, Amanda Best ("Best"), who was Patient A's case manager, and Amanda Bolden, who served as one of Patient A's nurses, made the decision to have Patient A transported by ambulance to Parkwest Hospital's emergency room. (Ohnstad Dep. 71; Austin Dep. Ex. 15; C. Williams Aff. ¶ 6.) PCMT discharged Patient A as a patient that same day. (Ohnstad Dep. 70; FREEDOM CARE PRO 006453.)

25.    During Patient A's hospital stay, PCMT officials worked with Patient A's family to coordinate his discharge from Parkwest Hospital into a nursing home. (Austin Dep. 53.) PCMT wanted Patient A transferred to a nursing home following his hospital discharge because DOL had not authorized his care, meaning PCMT risked not being paid for future services. (*Id.*)

---

[8] PCMT was paid for the services by the DOL in or around August 2012, after PCMT had already discharged Patient A. (Austin Dep. 54.)

26.	Patient A and his family preferred for him to receive in-home care at the time of his discharge from Parkwest Hospital in late June 2012. (Austin Dep. 52, 56.)

27.	Patient A's family was unable to locate a nursing home facility willing to admit Patient A prior to his discharge from Parkwest Hospital. (C. Williams Aff. ¶ 7.) Before Patient A's discharge from Parkwest Hospital, Charlotte Williams called Patient A's PCMT case manager and requested a PCMT nurse stay with Patient A the following day. (*Id.* ¶ 8.) PCMT refused Charlotte Williams' request. (*Id.* ¶ 8.)

28.	Charlotte Williams and her family provided care for Patient A during the two- week period following his discharge from Parkwest Hospital without any assistance from an in-home health care company. (C. Williams Aff. ¶ 9.) Neither Charlotte Williams nor any member of her family had any training to provide the type of medical care required by Patient A. (*Id.* ¶ 9.)

29.	After the first week of being responsible for Patient A's care, Charlotte Williams received a call from Sandra Davis ("Davis"), an ACT for Health employee who provided care to Patient A prior to his discharge from PCMT. (C. Williams Aff. ¶ 10.) Davis notified Charlotte Williams about the services provided by Freedom Care. (*Id.* ¶ 10.) Charlotte Williams also learned about Freedom Care's services through advertisements. (*Id.* ¶ 10.)

30.	Patient A's family selected Freedom Care, in conjunction with its agreement with Jellico Hospital, to provide in-home care for Patient A. (C. Williams Aff. ¶ 10.) This decision allowed Patient A to receive proper medical care from qualified care providers. (*Id.* ¶ 10.) Patient had been discharged by PCMT at the time Charlotte Williams made her decision. (*Id.* ¶ 11.)

31.     PCMT provided skilled, in-home services to Patient B.  (Ohnstad Dep. 73.)

32.     Patient B learned about Freedom Care from his massage therapist, who advised Patient B that Freedom Care provided in-home medical treatment and in-home homemaker services. (Patient B Aff. ¶ 3.) Based upon his massage therapist's recommendation, Patient B contacted Freedom Care to learn more about the services provided by Freedom Care. (*Id.* ¶ 5.) Patient B subsequently made the decision to request Freedom Care to provide medical care and homemaker services to him.  (*Id.* ¶ 7.)  No one at Freedom Care contacted Patient B prior to his conversation with the massage therapist in which she provided information about Freedom Care.  (*Id.* ¶ 8.)

33.     At the time Patient B asked Freedom Care to provide services to him, PCMT did not provide homemaker services.  (*Id.* ¶ 6.)

### vii.    ACT for Health Has Not Sustained Any Compensable Damages.

34.     During his deposition on June 20, 2013, approximately ten months after Act for Health filed  its lawsuit against Freedom Care, Austin testified that "[w]e have not been able to estimate" ACT for Health's damages "as of yet."  (Austin Dep. 184.)  Austin also testified that ACT for Health had not even attempted to calculate its damages at any time prior to his deposition.  (Austin Dep. 154.) He did, however, offer testimony regarding the types of damages that he believed ACT for Health should recover in this proceeding.  (*Id.*)

Q:     Without calculating the damages, what damages are you claiming ACT for Health has sustained in this lawsuit?

A:     Well, I know we've lost some patients.

Q:     What patients?

11

A: We've lost [Patient B] and [Patient A]. We've also potentially lost relationships with physicians and referral sources, and we've lost some employees through this process.

Q: Anything else?

A: Potentially our reputation within the community has been damaged.

Q: How has it been damaged?

A: A good example, typically we wouldn't lose a patient that we've provided care for, extending services for free for 18 months usually. Those are relationships there, very strong and loyal, and in this case, we've not only lost the patient, but we've, you know, the family will no longer return our calls. So I'm not sure how relationships with their physicians have been damaged during that process and potential referral sources. I think that's something we'll learn more about through the depositions.

Q: Anything else, any other way you believe you've been damaged by Freedom Care?

A: Certainly, we've had to incur expenses to get our license and Certificate of Need, and Freedom Care has not had to go through those same proceedings and same costs, and it gives them an unfair advantage.[9]

(Austin Dep. 154-55.)

### C. The Amount of ACT for Health's Legal Fees Is Disputed.

35. ACT for Health claims "it had to engage a law firm to assist with the complicated and lengthy [CON] process, and incurred nearly $70,000 in legal expenses." (Pltf.'s Br. 4.)

36. PCMT's CON Application included a Project Cost Chart on which PCMT represented that its "Legal, Administrative (Excluding CON Filing Fee), Consultant Fees" were $25,000. (Austin Dep. Ex. 1 (PCM 000089).) The Project Cost Chart, along with the other representations included in the CON Application, was verified

---

[9] This testimony is inconsistent with the statement in PCMT's verified CON that a "joint venture" was "more costly" than obtaining a CON. (Austin Dep. Ex. 1 (PCM 000095).)

12

under oath by Looney, PCMT's attorney and lawful agent. (Austin Dep. Ex. 1 (PCM 000101).)

## II.    Summary Judgment Standard

The proper summary judgment standard, as set forth by this Court in *Yarnell v. TransAmerica Life Ins. Co.*, 694 F.Supp. 2d 857, 861 (E.D. Tenn. 2010), was cited in Freedom Care's Memorandum of Law in Support of Its Motion for Summary Judgment. [Doc. 35-1, p. 17.), and does not need to be repeated here. That ACT for Health is not entitled to summary judgment, under either *Yarnell* or the record before the Court, is clear.

## III.    Argument

### A.    ACT for Health's Attempt to Close Freedom Care's Doors Should be Rejected.

This lawsuit is not the first time that ACT for Health has attempted to close Freedom Care's doors. In May 2012, ACT for Health complained to the Tennessee Department of Health that Freedom Care was providing services without the proper licensure. (Austin Dep. 145-46.) The Tennessee Department of Health is empowered to investigate and file suit against any home care organization that it believes is providing home care services without a license. *See* Tenn. Code. Ann. §§ 68-11-213; 68-11-214. The fact it took no such action speaks volumes.

The basis for ACT for Health's complaint against Freedom Care is inconsistent with its approach to providing services in Tennessee. After all, ACT for Health has a contractual relationship with PCMT that is similar to the relationship between Freedom Care and Jellico Hospital. Like Freedom Care, ACT for Health is not licensed to provide skilled, in-home medical services in Tennessee. (Austin Dep. 8.) Like Freedom Care, ACT for Health has a contract with a licensed home healthcare company (PCMT) through which its nurses provide skilled, in-home nursing services. (*Id.* 16-17.) Accordingly, ACT for Health has done and

13

continues to do precisely what it claims Freedom Care should not be doing. This inconsistency explodes the myth that ACT for Health's claim has any merit.

ACT for Health's complaint against Freedom Care is inconsistent with statements included in the verified CON Application PCMT submitted to the Tennessee Health Services and Development Agency in August 2007. (Austin Dep. Ex. 1.) In its CON Application, PCMT contemplated the exact relationship that Freedom Care maintains with Jellico Hospital. (*Id.* (PCM 000095).) Of course, at the time, it was in PCMT's best interest to reserve the right to enter into such an agreement, in the event its CON Application was denied. ACT for Health should be barred from taking a contrary legal position simply because the opposite approach is now more economically advantageous.

Austin's testimony made it clear that profits motivated PCMT to pass on pursuing a joint venture relationship with a licensed home care provider and, instead, file a CON Application. (Austin Dep. 156-57.) That is because ACT for Health preferred to keep all the money relating to the care it provided to DOL patients rather than share it with a business partner. (*Id.*) It is equally clear that profit – or the opportunity for increased profits – is behind ACT for Health's persistent campaign against Freedom Care and, indirectly, Jellico Hospital. Use of the courts to stymie legitimate competition, simply for the opportunity to increase profits, should not be permitted.

## B. ACT for Health's Argument Omits Critical Parts of the Regulations upon Which It Relies.

The governing regulations permit the arrangement agreed upon by Jellico Hospital and Freedom Care. Rules, 1200-08-26-.06(1). The applicable regulation provides:

> [a]n agency shall provide at least one of the qualifying home health services directly through agency employees, but may arrange with another licensed

14

organization or health care professional to provide any additional home health services. Home health services provided under arrangement with another licensed home care organization or professional organization shall be subject to a written contract conforming with the requirements of this Chapter.

*Id.* The Tennessee Department of Health's failure to take any action against Freedom Care after ACT for Health's May 2, 2012 complaint suggests that Freedom Care and the Tennessee Department of Health interpret the regulation similarly.

Under the second sentence of the regulation, Freedom Care is a professional organization that is able to provide services without a license. *See* Rules 1200-08-26-.06. Even assuming *arguendo* that the regulation does not permit such an approach, the nurses employed by Freedom Care to provide services pursuant to its Agreement with Jellico Hospital are licensed health care professionals qualified to provide services under the first sentence of the regulation.[10] *See* Rules 1200-08-26-.06. Therefore, under either sentence of the regulation, the arrangement between Jellico Hospital and Freedom Care is permissible. *See* Rules, 1200-08-26-.06.

ACT for Health next contends that Jellico Hospital delegated administrative and supervisory functions to Freedom Care in violation of Rule 1200-08-26.04(5). (Pltf.'s Br. 11) (citing Rules, 1200-08-26-.04(5)). This argument, of course, ignores Hill's patient visits, case conferences with Freedom Care officials and meetings with Hamman to discuss the DOL patients for which Jellico Hospital is responsible. (Hamman Dep. 23-24, 28, 31, 33.)

It also ignores the fact that even ACT for Health's counsel recognized the supervisory nature of Hill's oversight in a question to Hamman. (*Id.* 20-21.) The deposition exchange occurred as follows:

---

[10] ACT for Health's Brief omits the portion of the regulation that an agency may provide certain home health services through a "health care professional" or a "professional organization." Instead, ACT for Health focused on the section of the regulation relating to the fact certain home health services could be provided by "another licensed organization." This omission is curious, at best, and suggests ACT for Health understands that the inclusion of the remaining portion of the regulation delivers a fatal blow to its claim.

Q:      And as I understand it, Ms. Hill, as the designated employee, makes supervisory visits with clients seen by Freedom Care employees and meets with Freedom Care administrative staff to discuss patient care; is that correct?

A:      That's correct.

(*Id.*) The supervision component of the regulation, therefore, is met by Jellico Hospital's oversight over the DOL patients and Freedom Care caregivers. (Hamman Dep. 23-24, 28, 31, 33.)

The administrative component of the regulation is satisfied by Jellico Hospital gathering and maintaining control of the DOL patient medical records, preparing notes relating to case conferences with Freedom Care, requiring Freedom Care to make available Jellico Hospital's policies and procedures for Freedom Care's staff to review, receiving payments from the DOL and making payments to Freedom Care for the services provided by Freedom Care pursuant to the Agreement. (Garner Aff. ¶ 3; Garner Dep. Ex. 33.)

C.      **ACT for Health's Reliance upon *Scott* is Misplaced.**

ACT for Health relies upon *Scott v. Ashland Healthcare Ctr.*, 49 S.W.3d 281, 286-87 (Tenn. 2001) in support of its argument that Freedom Care violated Tenn. Code Ann. § 68-11-204 and related regulations by operating a home care organization without a license. *Scott's* facts, however, are distinguishable and its holding is not controlling as it relates to Freedom Care.

In *Scott*, a wrongful death action was filed against several corporate entities on behalf of the decedent's beneficiaries. 49 S.W.3d at 282. The reason several corporate entities were named as defendants was because the entity operating the long term care facility at the time of the decedent's death was different than the entity that was awarded the CON. *Id.* The question for the court was "whether the holder of a certificate of need may be held liable for the

16

healthcare facility operator's tortious acts." *Id.* at 281. The court concluded that "[p]ublic policy and common sense interpretation of the statutory certification and licensing scheme require this duty [operation of the health care facility] be non-delegable." *Id.* at 287.

No such facts exist here. The terms of the relationship between Jellico Hospital and Freedom Care are governed by the Agreement. (Garner Dep. Ex. 33.) The Agreement does not attempt to transfer Jellico Hospital's license. (*Id.*) Nor does it permit Freedom Care to "rent" Jellico Hospital's license, despite ACT for Health's repeated assertions to the contrary. Instead, it simply outlines the terms of a relationship that is specifically contemplated and allowed by the controlling regulations. (Garner Dep. Ex. 33.)

ACT for Health seems to suggest that *Scott* prohibits "the delegation of [any] responsibility" by Jellico Hospital to Freedom Care. (Pltf.'s Br. p. 12.) The only prohibition recognized by the court, in *Scott,* was the delegation of a license without approval from the State. *Scott,* 49 S.W.3d at 287. *Scott* does not restrict a licensed entity, like Jellico Hospital, from delegating other obligations to another entity if permitted by the governing regulations. *Id.*

*Scott*'s application to this case relates only to ACT for Health's assertion that it "was granted a Certificate of Need and a license" by the State of Tennessee. (Pltf.'s Br. p. 2.) It is clear from *Scott* that PCMT may not transfer either its CON or license to ACT for Health without approval from the State of Tennessee. 49 S.W.3d at 287 (where the Tennessee Supreme Court determined that the CON and license may not be transferred without approval from the State of Tennessee, despite the fact the various corporate entities were closely affiliated.) Austin's testimony makes it clear that PCMT did not transfer its CON and license to ACT for Health. (Austin Dep. 8-9.)

17

As predicted in Freedom Care's Memorandum of Law in Support of its Motion for Summary Judgment ("Freedom Care's Brief"), ACT for Health argues that it and PCMT should be considered one entity for the purpose of this lawsuit. (Freedom Care's Br. pp. 19-20.) For the reasons explained in Freedom Care's Brief, which are incorporated herein by reference, as if copied verbatim, ACT for Health and PCMT should not be considered one entity for the purpose of this lawsuit. *See Id.*

### D. The Tennessee Department of Health May Regulate Freedom Care.

ACT for Health argues that agreements, like the one between Jellico Hospital and Freedom Care and the one between ACT for Health and PCMT, would result in "no oversight with respect to entities providing care to patients, including those patients who are seriously ill, at-risk, and receiving care in the privacy of their own homes." (Pltf.'s Br. 14.) Tennessee law indicates otherwise. *See* Tenn. Code Ann. § 68-11-213(a)(1). (The Tennessee Department of Health has the authority "to initiate proceedings seeking injunctive relief and any other form of relief available in law or equity against any person who owns, operates, manages, or participates in the operation of or management of any facilities required to be licensed under this part, or any resident or residents in any facility required to be licensed under this part, without having the license required by this part.").

This argument is further undercut by ACT for Health's actions before this lawsuit was filed. That is because on May 2, 2012, Austin, ACT for Health's President, and Looney, an attorney who represents PCMT, attended a Tennessee Department of Health meeting on behalf of PCMT and spoke in support of PCMT's complaint against Freedom Care and other health care providers. (Austin Dep. 3, 145-47.) ACT for Health's complaint was made to the Tennessee Department of Health because it believed Freedom Care and the other health care

18

providers were subject to oversight by the Tennessee Department of Health. Its new position to the contrary is without merit.

### E. Freedom Care Provides Satisfactory Patient Care.

Another flaw in ACT for Health's position is the fact it offers a solution without identifying a problem that requires correction. Despite having approximately one year to identify any shortcomings regarding the care provided by Freedom Care, it does not even suggest that Freedom Care's services were unsatisfactory, much less a danger to DOL patients. (Pltf.'s Br.) Clearly, if there were any such problems, ACT for Health's Brief would have trumpeted as many examples as possible. Its failure to do so undermines its argument completely.

### F. ACT for Health Is Not Entitled to Summary Judgment On Its Unfair Competition and Consumer Protection Act Claims.

ACT for Health's argument that Freedom Care "is engaging in unfair competition and deceiving consumers" assumes that Freedom Care "is operating a home care organization without a license." (Pltf.'s Br. 14.) Because its assumption is incorrect, for the reasons explained previously, ACT for Health's motion should be denied as it relates to the unfair competition and Tennessee Consumer Protection Act ("TCPA") claims.

The request for partial summary judgment should be denied for other reasons as well. Both the unfair competition and TCPA claims require an element of compensatory damages. For the reasons explained in Freedom Care's Brief, which are incorporated herein by reference, as if copied verbatim, ACT for Health cannot establish any compensable damages under either legal theory. (Freedom Care Br. pp. 30-32.) The absence of any compensable damages not only precludes the entry of an Order granting ACT for Health's Motion for Partial Summary Judgment in connection with these claims, it bars them altogether. *See Id.*

19

ACT for Health's Motion for Partial Summary Judgment in connection with its unfair competition claim should also be denied because it cannot establish a viable underlying claim, as explained in Freedom Care's Brief. (Freedom Care's Br. p. 30.) *See Dade Int'l, Inc. v. Inverson*, 9 F. Supp.2d 858, 862 (M.D. Tenn. 1998).

### G. The Tennessee Department of Health, Rather Than ACT for Health, Is Better Equipped to Protect the Public.

ACT for Health argues that the relief it requests "protects the public interest by preventing an unlicensed and unregulated entity from providing healthcare in violation of Tennessee law." (Pltf.'s Br. p. 17.) This statement is replete with problems for all the reasons explained previously. It also ignores the fact the controlling statutory scheme and regulations arm the Tennessee Department of Health with sufficient authority to protect the public and regulate the home care industry, including the services provided by Freedom Care and ACT for Health. *See* Tenn. Code Ann. § 68-11-213; 68-11-214.

That ACT for Health is motivated by something other than protecting the general public good is clear from the fact its Brief does not acknowledge the fact it, like Freedom Care, is providing home health services within the State of Tennessee, without a state license, pursuant to an Agreement with PCMT. Rather than concede the fact that ACT for Health and Freedom Care share similar business models, ACT for Health's Brief contends that it had both a CON and license, despite Austin's undisputed testimony to the contrary. (Austin Dep. 8-9.) Given these facts, the Tennessee Department of Health, as an independent and unbiased department, is better equipped than ACT for Health to regulate the home care industry in Tennessee. That ACT for Health does not agree with the Tennessee Department of Health's response to its May 2012 complaint is an insufficient reason for ACT for Health's attempt to assume this responsibility.

20

## IV.    Conclusion

For each and all of the foregoing reasons and all of the reasons set forth in Freedom Care's Memorandum of Law in Support of its Motion for Summary Judgment, Freedom Care respectfully submits that ACT for Health's request for partial summary judgment should be denied.

Respectfully submitted this 23rd day of August, 2013.


/s/ John E. Winters
Warren L. Gooch, BPR No. 005533
John E. Winters, BPR No. 016345
P.O. Box 629
Knoxville, TN 37901-0629
(865) 525-5134 (tel.)
(865) 522-5723 (fax)

*Attorneys for Defendant*


## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2013, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may gain access to this filing through the Court's electronic filing system.


/s/ John E. Winters
John E. Winters (BPR No. 016345)