| | | |
|---|---|---|
| ACT FOR HEALTH d/b/a | ) | |
| PROFESSIONAL CASE MANAGEMENT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:12-cv-00442 |
| | ) | Judge Varlan |
| vs. | ) | Magistrate Judge Guyton |
| | ) | |
| CASE MANAGEMENT ASSOCIATES, INC. d/b/a | ) | |
| FREEDOM CARE, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Plaintiff ACT for Health, d/b/a Professional Case Management ("PCM"), by and through

its attorneys, respectfully submits its response to the Motion for Summary Judgment [Doc. 41]

filed by Defendant Case Management Associates, Inc. d/b/a Freedom Care ("Freedom Care").

## INTRODUCTION

Freedom Care built its business by stealing PCM's employees and patients, and by

avoiding the rules and regulations governing home care organizations in Tennessee. The

undisputed facts show that Freedom Care is operating unlawfully because it has no license or

Certificate of Need, both of which are required to operate a home care organization in

Tennessee. As a result, Freedom Care is engaging in unfair competition and deceptive practices

under Tennessee's Consumer Protection Act ("TCPA").

Genuine issues of fact exist, however, as to PCM's claims that Freedom Care interfered

with PCM's relationships with existing and prospective patients, and PCM's contracts with its

employees. Viewing the facts and inferences to be drawn from such facts in the light most

favorable to PCM, as this Court must, a reasonable jury could easily conclude that Freedom Care engaged in a pattern of unlawful and tortious behavior, which has resulted in real and ascertainable damages to PCM. Thus, as explained more fully below, Freedom Care is not entitled to summary judgment in this case.

<u>STATEMENT OF DISPUTED MATERIAL FACTS</u>

Freedom Care's statement of facts is not entirely undisputed, and there are a number of additional facts that are pertinent to the determination of Freedom Care's Motion:

**I.     FREEDOM CARE USED PCM EMPLOYEES TO BUILD ITS BUSINESS.**

Freedom Care used PCM's current and former employees—without the knowledge or consent of PCM—to build its business. For example, Amanda Stinnett began working at PCM in approximately April 2010. **Ex. 1** (Ohnstad Aff. p. 1, ¶4).[1] As a condition of her employment, Ms. Stinnett signed a restrictive covenant agreement with PCM. **Ex. 2** (Stinnett agreement). PCM requires its employees to sign such agreements to protect the substantial amount of time and resources it invests in finding patients and developing critical information about the patient's care, and to protect its trade secrets. *Id.* at 1, ¶1; **Ex. 1** (Ohnstad Aff p. 1, ¶3). The agreements prohibit, during and for one year after employment, PCM nurses from soliciting a patient to switch providers (which is consistent with Tenn. Code Ann. § 68-11-229), from continuing to provide care to a patient for whom the nurse provided care while at PCM, and from soliciting PCM employees to work for another entity. **Ex. 2** (Stinnett agreement p. 2, ¶3).

When she applied to PCM, Ms. Stinnett worked for On-Call Staffing, an entity with which Dee Garner (Freedom Care's owner) is affiliated. **Ex. 3** (Garner 37:2-17); **Ex. 1** (Ohnstad Aff. p. 1, ¶4). Within months after PCM hired Ms. Stinnett, in August 2010, Freedom

---

[1] PCM attached an index of exhibits to the end of this Response.

Care was incorporated. **Ex. 4** (Corporate formation document). Freedom Care's incorporation documents identify Ms. Stinnett's sister, Elizabeth Tietsworth, as the sole member and registered agent. *Id.* Like Ms. Stinnett, Ms. Tietsworth worked for Mr. Garner at On-Call Staffing. **Ex. 3** (Garner 8:3-20; 114:7-12).

According to Mr. Garner, Ms. Stinnett began assisting with Freedom Care as early as 2010 or 2011. *Id.* (Garner 118:13-17). Although Mr. Garner knew that Ms. Stinnett had engaged in health care fraud, he nevertheless relied on her to help start Freedom Care. *Id.* (Garner 120:8-23; 123:5-13; 123:20-24). Ms. Stinnett is the one who initiated the contact with Jellico Community Hospital ("Jellico") to investigate a potential relationship between Jellico and Freedom Care, which occurred sometime in 2010. *Id.* (Garner 171:17-19; 172:19-23; 173:8-12; 174:8-13). In fact, Ms. Stinnett was at the initial meeting between Jellico and Freedom Care. **Ex. 5** (Hamman 41:12 – 42:8). In addition, in August 2011—while Ms. Stinnett was still employed by PCM—Mr. Garner referred to her as Freedom Care's saleswoman. **Ex. 6** (8/2/11 e-mail).

In November 2011, Ms. Stinnett was handing out cards for Freedom Care, although she was using a different last name.[2] **Ex. 1** (Ohnstad Aff. p. 2, ¶6; **Ex. 9** (e-mail exchange regarding card). PCM nurses also began finding Freedom Care cards and literature in PCM patients' homes around that same time. **Ex. 7** (Davis Aff. p. 2, ¶13). In December 2011, PCM finally discovered that Ms. Stinnett was working for Freedom Care. **Ex. 1** (Ohnstad Aff. p. 2, ¶7). As a result, PCM discharged Ms. Stinnett in December 2011. *Id.*

Although PCM was not aware of Ms. Stinnett's activities for Freedom Care, it appears likely that Mr. Garner was well aware of her dual employment. Ms. Stinnett and Mr. Garner

---

[2] The card refers to Amanda Owen. **Ex. 3** (Garner 103:15-20; 117:5-11); **Ex. 7** (Davis Aff. p. 3, ¶13). Notably, Ms. Stinnett told PCM that she needed to take a leave of absence in November 2011 due to family issues, but at the same time she continued to work for Freedom Care. **Ex. 1** (Ohnstad Aff. p. 1, ¶5); **Ex. 8** (Stinnett e-mail to Dee Garner).

knew each other for years; Ms. Stinnett's sister also worked for Mr. Garner and was listed on Freedom Care's original corporate filings; and Ms. Stinnett appears to be one of the primary people involved in helping to get Freedom Care off the ground. **Ex. 3** (Garner 124:10-125:19).

Notably, Ms. Stinnett was not the only PCM employee Freedom Care used to build its business. Ms. Stinnett referred Freedom Care to another PCM employee, Jennifer Robbins, who Freedom Care hired as a "consultant" to assist it in the early stages. **Ex. 3** (Garner 142:18-20; 144:6-9; 144:19-146:2). Ms. Robbins, who had worked for PCM for approximately three years, was the Senior Case Manager and backup Nurse Administrator. Her last day with PCM was October 27, 2011, and it appears she began her consulting services for Freedom Care that very same day, if not before. **Ex. 1** (Ohnstad Aff. p. 2, ¶11); **Ex. 10** (Robbins invoices). Similarly, Freedom Care hired Tiffany Hall, another former PCM employee. **Ex. 3** (Garner 105:23-106:3; 131:4-5); **Ex. 1** (Ohnstad Aff., p. 2, ¶10). Ms. Stinnett and Ms. Hall were initially responsible for the day-to-day operations of Freedom Care. **Ex. 3** (Garner 131:4 – 132:8, 150:13-18).

## II.     FREEDOM CARE STOLE PCM'S PATIENTS.

Not surprisingly, after using PCM's current and former employees to help build its business, and distributing cards and literature in the homes of PCM's clients, Freedom Care stole two of PCM's patients.

### A.     Freedom Care's conflicting explanations concerning Patient A.

PCM provided in-home, skilled nursing care to Patient A for 18 months, without any reimbursement from the Department of Labor ("DOL"), Patient A, or his family.[3] Freedom Care Mem. of Law in Supp. of Mot. for Summ. J. [Doc. 41] ("FC Mot.") p. 12, ¶34; **Ex. 11** (Austin

---

[3] Patients A and B are identified in the Patient Roster submitted with Freedom Care's brief. As to Patient A, PCM had initially received authorization for his care, but PCM continued to provide care to Patient A while it sought reauthorization for continued care. **Ex. 1** (Ohnstad Aff. p. 2, ¶12).

54:2-6).  During that time, PCM worked with the DOL to obtain authorization for the care and ensure that Patient A would receive, free of charge, the in-home healthcare to which he was entitled under the EEOICPA.  *Id.*  In fact, PCM even escalated its efforts to the DOL's national office in Washington, D.C., due to the DOL's extended delays in authorizing Patient A's care. **Ex. 11** (Austin 56:17-21).  Eventually, Patient A needed to go to the hospital.  At that point, PCM was working with the family to coordinate care through a nursing home.  **Ex. 12** (Ohnstad 22:9-16; 71:2-9).  The only way for Patient A to obtain authorization for nursing home care was for PCM to discharge him.  **Ex. 12** (Ohnstad 22:9-16).  What happened next is in dispute.

According to Patient A's daughter-in-law, Charlotte Williams, she learned about Freedom Care from Freedom Care advertisements and from Sandra Davis, a PCM nurse.  FC Mot. p. 13, ¶40.  According to Ms. Davis, however, Ms. Williams contacted Ms. Davis, asking for Ms. Davis help to care for Patient A, *after* Ms. Williams had already learned of Freedom Care.   **Ex. 7** (Davis Aff. p. 3, ¶13).

Significantly, in a letter written before her affidavit, Ms. Williams did not mention Ms. Davis.  **Ex. 13** (Williams Letter).  Moreover, as early as March 9, 2012, Mr. Garner informed Jellico that he had two patient referrals "brewing," one of which was 168 hours per week and was already receiving care through another provider.  **Ex. 14** (March 9 e-mail).  Patient A, like the patient referenced in Mr. Garner's e-mail, was receiving 168 hours of care per week from PCM at the time.  **Ex. 1** (Ohnstad Aff. p. 2, ¶12).

Although the circumstances of Patient A transitioning to Freedom Care are disputed, what occurred after the transition is, for the most part, undisputed.  Freedom Care, through Ms. Stinnett or others, convinced six of Patient's A's nurses from PCM to continue providing care for Patient A—through Freedom Care.  **Ex. 1** (Ohnstad Aff. p. 2, ¶13).  At least one of those nurses,

Sandra Davis, did not have to interview with Freedom Care, nor did she receive any orientation or training. **Ex. 7** (Davis Aff. p. 2, ¶10.)  Of course, that is not surprising given that she had already been providing care to Patient A.

Notably, Ms. Stinnett and Ms. Hall had both signed restrictive covenant agreements as a condition of employment with PCM.  **Ex. 1** (Ohnstad Aff. p. 3, ¶14.)  By recruiting the nurses, especially Ms. Davis, Ms. Stinnett violated her agreement with PCM, which prohibited her from "directly recruit[ing], hir[ing], or attempt[ing] to directly recruit or hire, any other worker of the Company with whom Employee had contact . . . during the last twelve (12) months of Employee's employment with the Company."  **Ex. 2** (Stinnett Agreement, p. 2, ¶3). Further, it is reasonable to assume Ms. Stinnett and Ms. Hall knew that recruiting those nurses, and asking them to continue caring for Patient A, violated the nurses' agreements with PCM, because Ms. Stinnett and Ms. Hall had signed the same agreements as the nurses.  **Ex. 2** (Stinnett Agreement) (agreements prohibit PCM employees from providing care to a patient or prospect with whom they had contact while at PCM).

Mr. Garner and John Sutherland, Freedom Care's administrator, claim they were not aware that Ms. Stinnett or the other PCM nurses had signed any type of agreement with PCM when they were hired by Freedom Care.  FC Mot. p. 11, ¶32.  Regardless, Messrs. Garner and Sutherland admit that they eventually became aware of such agreements, yet they took no action to prevent the nurses from continuing to breach their agreements with PCM.  Instead, Freedom Care essentially ignored the agreements between PCM and its nurses.   **Ex. 3** (Garner 154:14-155:4; 158:8-159:10; 160:6-22).

### B. Freedom Care stole Patient B.

Patient B claims that he learned of Freedom Care through his massage therapist, and he switched from PCM to Freedom Care because PCM did not provide unskilled care at that time. FC Mot. pp. 13-14. This explanation is dubious, at best. At the time he left PCM in December 2011, Patient B was receiving skilled in-home nursing care. **Ex. 1** (Ohnstad Aff. p. 2, ¶9). Freedom Care, however, did not provide skilled in-home nursing care to Patient B until March 2012. **Ex. 3** (Garner 194:4-22). In other words, Patient B gave up skilled in-home care when he switched to Freedom Care, and he did not obtain such care again for another three months, *i.e.*, just after Freedom Care signed its agreement with Jellico. About a month or so later, he ban receiving care 24 hours a day, seven days a week. **Ex. 15** (Freedom Care referral chart).

Moreover, Patient B switched providers around the same time that PCM began discovering Freedom Care cards and brochures in its patients' homes, including cards with Ms. Stinnett's name on them.

### III. FREEDOM CARE IS UNLAWFULLY OPERATING A HOME CARE ORGANIZATION.

Freedom Care knew that it could not provide skilled, in-home healthcare in Tennessee without a Certificate of Need or license. **Ex. 3** (Garner 73:21-74:16; 77:15-79:7; 90:13-91:11; 110:21-111:6). But it did not allow those rules to stand in its way. Instead, Freedom Care found Jellico, a licensed agency with a Certificate of Need. FC Mot. p. 2, ¶4. Freedom Care provides all the patient care, and in return, it pays Jellico for the privilege of being able to claim that it is providing services under Jellico's license. Stated another way, Jellico is renting its license to Freedom Care. **Ex. 16** (in an e-mail to Dee Garner, Jellico's CFO stated: "Basically the argument here is that it still feels like we are just renting you our Home Health CON for a 10% fee . . . .").

From the beginning, Freedom Care and Jellico recognized that their relationship, as contemplated at the time, did not fit within Tennessee's rules governing home care organizations. As early as November 2011, Pam Hamman, Sunbelt Homecare's Director, e-mailed Dee Garner, quoting the key Tennessee regulation that requires home health agencies to provide at least one of the qualifying home health services, and suggesting a "way to get around it." **Ex. 17** (Hamman e-mail). It is undisputed, however, that Jellico is not providing *any* care to the patients cared for by Freedom Care pursuant to its agreement with Jellico. PCM Mot. for Partial Summary Judgment [Doc. 31] ("PCM Mot.") p. 6.

Freedom Care's and Jellico's motive for pursuing this arrangement was clear: money. In response to concerns about oversight of Freedom Care's care provided to patients, Erik Wangsness, Jellico's Chief Executive Officer, said: "Ten thousand a month would come in handy." **Ex. 6** (Wangsness e-mail).

Although Freedom Care is unlicensed and unregulated, it has held itself out to the public as a home care agency. PCM Mot. pp. 9-10. Patient A supposedly learned about Freedom Care, in part, as a result of Freedom Care's advertisements. **Ex. 13** (Williams letter).

## **STANDARD OF REVIEW**

Summary judgment is inappropriate where there is a genuine issue of material fact. *See, e.g., Rebel Motor Freight, Inc. v. Freeman Drywall Co.*, 914 F. Supp. 1516, 1520 (W.D. Tenn. 1994) (citing Fed. R. Civ. P. 56(c)). The movant bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See id.*; *Clark Constr. Group, Inc. v. Eagle Amalgamated Serv.,* 190 F. Supp. 2d 1077, 1079 (W.D. Tenn. 2002). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

"The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder." *Paulk v. Sevier County, Tenn.*, 2013 WL 4495789, *2 (E.D. Tenn. Aug. 20, 2013), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986). Thus, when reviewing a motion for summary judgment, the "Court does not weigh the evidence or determine the truth of the matter." *Id.*, *citing Anderson*, 477 U.S. at 249. Similarly, the Court has no obligation to "search the record 'to establish that it is bereft of a genuine issue of material fact.'" *Id.*, *quoting Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). In this case, genuine issues of material fact exist as to all of PCM's claims, except as to PCM's claims for unfair competition and violation of the TCPA; as to those two claims, PCM is entitled to summary judgment. *See* PCM Mot. for Partial Summary Judgment [Doc. 31].

## ARGUMENT

I.    **GENUINE ISSUES OF FACT EXIST CONCERNING PCM'S CLAIM FOR TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE ECONOMIC ADVANTAGE.**

Freedom Care is unlawfully operating a home care organization in the same geographic area as PCM, it used PCM employees to develop its business, it improperly hired away PCM's nurses to provide services to its patients, and it has turned PCM's former patients against PCM. Given these facts, some of which are disputed and others of which are not, Freedom Care is not entitled to summary judgment with respect to PCM's claim for tortious interference with existing and prospective business relations (first claim for relief).

The elements of tortious interference with existing or prospective business relationships are:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;
> (2) the defendant's knowledge of that relationship and not a mere

awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, *see, e.g., Top Serv. Body Shop*, 582 P.2d at 1371; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Freedom Care has not raised any argument as to the second and third elements of this claim. Instead, Freedom Care claims that PCM cannot establish the first, fourth, or fifth elements identified above, *i.e.*, an existing or prospective relationship, improper motive or means, and damages, respectively. However, the undisputed and disputed facts, and the favorable inferences to be drawn therefrom, demonstrate that summary judgment concerning this claim is not warranted.

**A.      PCM had existing relationships with third parties and prospective relationships with an identifiable class of third persons.**

Freedom Care's sole argument with respect to the first element of PCM's tortious interference claim is that PCM is not the property party to raise the claim because the existing and prospective relationships were between PCM's wholly-owned subsidiary, PCM of Tennessee, and the patients at issue. FC Mot. pp. 19-20. Freedom Care's argument should be rejected for a variety of reasons.

**1.      PCM's wholly-owned subsidiary is willing to join or ratify this action pursuant to Fed. R. Civ. P. 17(a)(3).**

Freedom Care essentially arguing that PCM of Tennessee, rather than PCM, is the real party in interest.[4] As explained below, that is not correct. In any event, the Court need not reach

---

[4] Freedom Care should be prohibited from raising this argument for the first time in its summary judgment motion. *Hefley v. Jones*, 687 F.2d 1383, 1388 (10th Cir. 1982) (citation omitted); *Anderson v. Old Nat'l Bancorp*, 675 F. Supp. 2d 701, 708 (W.D. Ky. 2009) (recognizing the court's prior ruling that the defendant waived any real party in interest objection when it raised the objection for the first time in a summary judgment motion); *Manier, Herod, Hollabaugh & Smith v. Watson*, 1990 WL 26535, *2 (Tenn. Ct. App. 1990) (applying analogous state rule, holding that "where an action is prosecuted in the name of a partnership and the defendant insists

that issue because according to Fed. R. Civ. P. 17(a)(3), "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." After that time, "the action proceeds as if it had been originally commenced by the real party in interest." Such a rule makes sense, especially from the standpoint of conserving judicial resources. For example, if PCM's claims were dismissed not on the merits, but instead because its claims should have been asserted by PCM of Tennessee, then PCM of Tennessee would simply re-file the lawsuit, resulting in unnecessary expense, duplicative discovery, and a waste of judicial resources.

Moreover, adding or substituting PCM of Tennessee as a party will not impact the facts, the discovery (which has already been completed), nor will it impact the merits of the case in any way. *Chicago & Northwestern Transp. Co. v. Negus-Sweenie, Inc.*, 549 F.2d 47, 50 (8th Cir. 1977) ("As C. & N.W. Transport appears to be the successor corporation of C. & N.W. Railway, *the nature of Negus-Sweenie's objection goes to form, not substance*.") (emphasis added). Therefore, without addressing the merits of Freedom Care's technical argument concerning the proper party, the fact that PCM of Tennessee is willing to "ratify, join, or be substituted into the action" renders this issue moot.[5]

2.    PCM is authorized to assert this claim directly.

Assuming the Court reaches the merits of Freedom Care's argument, neither of the cases upon which Freedom Care relies hold that a parent corporation cannot pursue a tortious

---

that the claim belongs to one of the individual partners or an associate of the firm, that defense should be made promptly so that the proper party may be substituted. Otherwise, the defense is waived").

[5] PCM will be filing a separate motion, pursuant to Rule 17(a)(3) and, alternatively, Rule 15, to add or amend the Complaint to join PCM of Tennessee, in the event the Court deems such action necessary.

interference claim on behalf of a wholly-owned subsidiary in this situation, or that a wholly-owned subsidiary cannot ratify or join the action once an objection has been raised. FC Mot. p. 19.

In fact, the Tennessee Supreme Court, relying in part on a case from the United States Supreme Court, has recognized the "unity of interest" between wholly-owned subsidiaries and their parent. *Waste Conversion Systems, Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 781-82 (Tenn. 2000), *quoting Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-72, 104 S. Ct. 2731 (1984). The court also noted that that a parent and its wholly-owned subsidiary's "'financial interests [are] identical, since the parent control[s] the subsidiary and its profits.'" *Id.*, *quoting Am. Medical Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 336 (Tex. Ct. App. 1991).

Consistent with *Waste Conversion Systems*, a number of courts have recognized that parent corporations can sue on behalf of their wholly-owned subsidiaries. *See, e.g.*, *Advanced Nano Coatings, Inc. v. Hanafin*, 478 Fed. Appx. 838, 842 (5th Cir. 2012) ("Generally speaking, Vado, as a parent corporation to ANC, would have standing to bring suit on behalf of ANC," its wholly-owned subsidiary) (*citing Franchise Tax Bd. of Cal. v. Alcan Aluminum*, 493 U.S. 331, 336, 110 S.Ct. 661 (1990)); *Dalton v. Honda Motor Co.*, 425 Fed. Appx. 886, 890 (Fed. Cir. 2011) (in trademark context, "[a] parent company has standing to file an opposition on behalf of its wholly-owned subsidiary because it can 'reasonably believe that damage to the subsidiary will naturally lead to financial injury to itself.'" (citations omitted)) (collecting cases); *Lambrecht v. O'Neal*, 3 A.3d 277, 288 (Del. 2010) ("As the sole owner of Merrill Lynch, BofA

is not required to proceed derivatively; it may enforce that claim by the direct exercise of its 100 percent control.").[6]  As a result, Freedom Care's argument must be rejected.

3.  <u>PCM had existing and prospective relationships with patients.</u>

Aside from its arguments concerning the distinction between PCM and PCM of Tennessee, Freedom Care provided no basis to attack the first element of PCM's tortious interference claim, nor does any such basis exist.  FC Mot. p. 19: "the service agreement and business relationship existed between [PCM of Tennessee] and Patient A and Patient B." Significantly, PCM was still working with Patient's A's family to try to obtain authorization for care, even after he was discharged from care.

Nor did Freedom Care challenge the fact that PCM has a prospective relationship with those patients who may be eligible for care under the EEOICPA, which is "an identifiable class of third persons."  *Trau-Med*, 71 S.W.3d at 701.  Consequently, PCM can satisfy the first element of its tortious interference claim.

**B.      Freedom Care had an improper motive *or* used improper means.**

Freedom Care asserts that PCM's tortious interference claim must fail because PCM cannot establish that Freedom Care acted with an improper motive or means "with respect to Patient A and Patient B."[7]  FC Mot. p. 20.  The determination of whether Freedom Care "acted

---

[6] PCM is aware of an unpublished district court decision espousing a different principle, although the court ultimately declined to dismiss the claims brought by the parent corporation. *MSS, Inc. v. Maser Corp.*, 2011 WL 2938424 (M.D. Tenn. July 18, 2011).  That case, and the cases upon which it relies, do not address Rule 17(a), nor do they address the authority from the other circuits cited above holding that a parent company may sue on behalf of a wholly-owned subsidiary.  Regardless, *MSS, Inc.* is not binding on this Court, and the Court need not reach the issue in any event because PCM of Tennessee is willing to ratify, join in or substitute for the Plaintiff in this action.

[7] Freedom Care did not raise any argument with respect to its improper motive or means with respect to "an identifiable class of third persons," *i.e.*, patients eligible for services under the EEOICPA.  Instead, it limited its arguments to *existing* relationships with Patients A and B.

'improperly' or possessed an 'improper' motive is dependent on the particular facts and circumstances of a given case. . . ." *Trau-Med*, 71 S.W.3d at 701 n.5.

      1.    <u>Freedom Care's improper *motive*.</u>

Freedom Care initially argues that PCM cannot rely on an improper *motive* as a result of the competitor's privilege. FC Mot. pp. 18, 20, *citing PPG Indus. v. Payne*, 2012 WL 1836314 (E.D. Tenn. May 21, 2012). Freedom Care's argument is ironic given that it claims it is not a home care organization, subject to the same licensure and Certificate of Need requirements as PCM. Freedom Care cannot have it both ways: if it is not a home care organization, it should not be entitled to take advantage of the competitor's privilege.

The facts could easily lead a jury to conclude that Freedom Care had an improper motive in this case. Freedom Care relied on Amanda Stinnett, who was working at PCM at the time, to help build its business, as well as Jennifer Robbins, who may also have been at PCM while she was consulting with Freedom Care. It is not unreasonable to conclude that Mr. Garner and Ms. Stinnett planned from the beginning for Ms. Stinnett to gather information from PCM while she worked there to help Freedom Care establish itself. Ms. Stinnett and Mr. Garner have a long history; Ms. Stinnett's sister is listed as the sole member on Freedom Care's corporate formation documents; and Mr. Garner hired Ms. Stinnett to assist with building Freedom Care, knowing she had engaged in fraud in the past. *See supra* at 2-3. Freedom Care also hired other PCM employees; Ms. Stinnett or Freedom Care left cards or brochures in PCM's patients' homes; and Freedom Care purposefully recruited Patient's A's nurses from Freedom Care, knowing that doing so would violate their agreements with PCM.

2.     <u>Freedom Care's improper *means*.</u>

The facts and inferences to be drawn therefrom also support that Freedom Care used improper *means*.   "The alternative requirement of improper means is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules. Such acts are illegal or tortious in themselves and hence are clearly 'improper' means of interference." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 308(Utah 1982); *Trau-Med*, 71 S.W.3d at 701, n.5.  Improper means can also include "misuse of inside or confidential information, or a breach of a fiduciary relationship," and "unfair competition."  *Trau-Med*, 71 S.W.3d at 701, n.5(citing *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987)).

Here, Freedom Care is operating in violation of Tennessee regulations, as it has no license or Certificate of Need. *See* PCM Mot. pp. 8-13.  In addition, and as set forth above, Ms. Stinnett was breaching her fiduciary duty to PCM by working for Freedom Care at the same time she worked for PCM, using her access to patient's homes to distribute information.  *Efird v. Clinic of Plastic and Reconstructive Surgery, P.A.*, 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003). And a reasonable jury could conclude that Freedom Care hired Patient A's nurses from PCM to ensure that Patient A would be comfortable switching providers, even though Ms. Stinnett was aware that hiring such nurses to care for Patient A violated the nurses' agreements with PCM. Viewing these facts in the light most favorable to PCM, a jury could conclude Freedom Care acted with an improper motive or means with respect to PCM.

**C.     Freedom Care interfered with PCM's relationships with Patients A and B.**

Despite the facts set forth above, Freedom Care argues that it used no improper means to interfere with PCM's relationship with Patients A and B.  Its arguments, however, are misplaced.

1. <u>Disputed facts exist with respect to Patient A's decision to use Freedom Care.</u>

Freedom Care claims that PCM had discharged Patient A and Freedom Care merely answered the patient's call for help. FC Mot. pp. 20-21. But viewing the facts and inferences in favor of PCM, as this Court must, a jury could easily reject Freedom Care's explanation. For example, PCM had provided care to Patient A—*for free*—for a period of 18 months while it sought reauthorization for his care from the DOL; PCM discharged Patient A because it felt that was the only way to secure a paid benefit of nursing home care for Patient A; PCM was attempting to work with the family to secure that benefit; Mr. Austin (PCM's President) even contacted the DOL's national office in Washington, D.C. in an effort to obtain benefits for Patient A. Thus, PCM had not abandoned Patient A.

Nor are the "facts" so clear-cut concerning how Patient A learned of Freedom Care. *See supra* at 5-6. As set forth above, a jury could also conclude that Freedom Care's decision to poach PCM's nurses, in violation of their agreements, helped Freedom Care convince Patient A to switch to Freedom Care.

Lastly, had Freedom Care not been operating illegally, Patient A almost certainly would have returned to PCM to receive the care authorized by the DOL shortly after his discharge from the hospital. Given PCM's substantial commitment to Patient A, it is unlikely—at best—that Patient A would have simply gone to another provider. Thus, a jury could easily conclude that Freedom Care employed improper means or had an improper motive with respect to Patient A.

2. <u>Freedom Care improperly interfered with PCM's relationship with Patient B.</u>

As to Patient B, Freedom Care claims he "contacted Freedom Care and asked for it to provide in-home medical care and homemaker services because Freedom Care could provide

both." FC Mot. p. 21. However, by switching to Freedom Care, Patient B gave up the skilled care he was receiving from PCM, during which time he received *less* care from Freedom Care, and yet shortly after Freedom Care and Jellico entered into their agreement, Patient B began receiving skilled care again. *See supra* at 7. Further, Patient B switched to Freedom Care around the same time that PCM began finding Freedom Care cards and brochures in its patients' homes. In light of these circumstances, a jury could conclude that Patient B or Freedom Care are not being completely candid about how their relationship was formed.

### D. Freedom Care damaged PCM.

As to the fifth element of PCM's tortious interference claim (the existence of damages), Freedom Care makes no argument about the fact that it has damaged PCM's prospective relationships with an identifiable class of third persons, nor could it. Freedom Care's illegitimate means of patient recruitment and provision of home health care in violation of Tennessee statutes and regulations has undoubtedly harmed PCM's prospective relationships with third parties. Indeed, Patient A's daughter-in-law is now claiming that PCM abandoned the care for her father, despite PCM expending significant resources to care and obtain continued benefits for him.

As to damages concerning existing relationships, the mere fact that Freedom Care is serving or has served Patients A and B is sufficient to demonstrate damages to PCM. "[O]nce an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004). It is enough to show the fact of the damage, which PCM has clearly done in this case.

Viewing the undisputed and disputed material facts in a light most favorable to PCM, summary judgment as to PCM's tortious interference with existing and prospective business relations is not appropriate.

## II. PCM'S REQUEST TO ENJOIN FREEDOM CARE FROM OPERATING UNLAWFULLY IN TENNESSEE IS APPROPRIATE.

Next, Freedom Care seeks to strike PCM's request for injunctive relief, though Freedom Care does not cite a single case or explicitly address the elements required for injunctive relief. Instead, Freedom Care makes a series of statements, none of which provide a legal basis to support its argument.

First, Freedom Care asserts that the State of Tennessee has taken no action against Freedom Care, despite a prior complaint from PCM about Freedom Care. FC Mot. p. 22. The Tennessee Department of Health's action or inaction against Freedom Care has no bearing on this Court's authority to enjoin unfair competition or unlawful conduct. *See Feldman v. Van Gorp*, 2010 WL 2911606, *2-3 (S.D.N.Y. July 8, 2010) (in *qui tam* action, court excluded evidence "relating to the DOJ's decision not to intervene and the inaction of other agencies" as irrelevant); *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 839 (Tenn. 2008) ("A statute does not require exhaustion when the language providing for an appeal to an administrative agency is worded permissively."); Tenn. Code § 68-11-213 (reflecting permissive, rather than mandatory, authority for the Tennessee Department of Health to initiate proceedings).

Next, Freedom Care claims that its relationship with Jellico is "similar to the relationship" between PCM and its wholly-owned subsidiary, PCM of Tennessee. FC Mot. pp. 22-23. Even if true, Freedom Care fails to explain how or why this precludes PCM from obtaining injunctive relief. In any event, the assertion is not accurate. No "unity of interest" exists between Freedom Care and Jellico, where Freedom Care is a mere subcontractor. **Ex. 3**

(Garner 164:16-25; 166:6-14). Nor has Freedom Care provided any authority suggesting that PCM's operations violate Tennessee law or regulations. On the other hand, PCM has provided ample authority to demonstrate that Freedom Care's relationship with Jellico *is* improper. PCM Mot.., pp. 11-14. Consequently, this argument, too, must fail.

Lastly, Freedom Care relies on a single statement in PCM's Certificate of Need application, arguing that PCM "contemplated the exact relationship that Freedom Care maintains with Jellico Hospital." FC Mot. p. 5, ¶15 (emphasis added), p. 23 ("[w]hile *it might be possible* for the applicant to *joint venture* with an existing home health agency in the service area to provide the services, that option would likely increase costs and decrease efficiency."). Presumably, Freedom Care is arguing that this statement is some type of admission that the relationship between Freedom Care and Jellico is proper. The plain language of the statement belies such an assertion, as PCM merely indicated that a joint venture "might be possible." PCM did not indicate that such a relationship was, in fact, appropriate or lawful, under what circumstances such a relationship might be lawful, or that it had even researched the issue. Thus, the statement is not an admission. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999) ("statements become judicial admissions only when they are 'deliberate, clear and unambiguous.'") (citations omitted). Even if the statement could be construed as an admission, it would not matter because Freedom Care and Jellico are *not* a joint venture. **Ex. 3** (Garner 166:6-10).

For all of these reasons, and for the reasons stated in PCM's Brief in Support of its Motion for Summary Judgment, Freedom Care's argument must be rejected.

**III.    FREEDOM CARE IS NOT ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PCM'S CLAIM FOR TORTIOUS INDUCEMENT TO BREACH CONTRACTS.**

AS to PCM's fifth claim for relief, for tortious inducement to inducement to breach, Freedom Care does not dispute that the PCM nurses it hired had an agreement with PCM or that it induced a breach of such agreements.  Instead, Freedom Care argues only that the nurses' agreements are unenforceable and that PCM cannot, as a matter of law, establish damages.  *See AmeriGas Propane v. Crook*, 844 F. Supp. 379, 388-389 (M.D. Tenn. 1993).  It is wrong on both counts.  Thus, summary judgment is unwarranted. FC Mot., p. 23.[8]

**A.    PCM's agreements' are enforceable under Colorado law.**

Restrictive covenants, such as those contained in the agreements between PCM and its nurses, are enforceable under Colorado law provided they: (1) meet an exception identified in Colo. Rev. Stat. § 8-2-113, and (2) are reasonable in terms of their geographic scope and duration.  Freedom Care does not challenge the reasonableness of the restrictions.  Instead, relying on Colo. Rev. Stat. § 8-2-113(2)(b), Freedom Care asserts that PCM's restrictive covenant agreements are unenforceable under Colorado law because PCM has no protectable trade secrets.  While this argument misses the mark, Freedom Care neglects to address another equally applicable exception found in section 8-2-113(2)(d): noncompete and nonsolicit agreements are enforceable if they involve "*employees who constitute professional staff* to executive and management personnel."  (Emphasis added.)  Freedom Care's failure to address or acknowledge this other exception should preclude it from challenging the exception in its reply

---

[8] Freedom Care refers to the claim as tortious interference with contract, and repeats its arguments with respect to Patients A and B.  FC Mot. pp. 23-24.  PCM incorporates by reference its prior arguments with respect to Freedom Care's interference with PCM's contracts with its patients.

brief. *Hibbs v. Hernandez*, 2006 U.S. Dist. LEXIS 9298, *11-13 (E.D. Tenn. Feb. 17, 2006) (parties cannot raise arguments for the first time in a reply brief).

    1.    <u>A question of fact exists concerning the "professional staff exemption.</u>

Whether any particular employee falls within the "professional staff" exemption is an issue of fact. *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 621-22 (10th Cir. 1991). "Professional employee" has been defined as "such persons as legal, engineering, scientific and *medical* personnel together with junior professional assistants." *Boulder Medical Center v. Moore*, 651 P.2d 464, 465 (Colo. App. 1982) (*quoting NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 284 (1974)) (emphasis added). As a result, a jury must determine whether PCM's nurses qualify as "professional staff," thus rendering summary judgment as to PCM's fifth claim for relief improper.

    2.    <u>The existence of trade secrets is a question of fact.</u>

Similarly, what constitutes a trade secret is a question of fact. *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1341 (Colo. App. 1984). Here, the agreements contain an acknowledgement concerning the existence of trade secrets, which should be binding on the nurses and Freedom Care. *See Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911-12 (Colo. App. 1997) (when the terms of an agreement "declare that confidential information constitutes 'trade secrets'" of an employer, an employee is bound by this admission and "the confidentiality of this information will not be subject to contest."). Aside from the acknowledgment, patient information is confidential and valuable business information that is important to the commercial operation of a health care practice. *See, e.g., Total Care Physicians, P.A. v. O'Hara et al*, 798 A.2d 1043, 1054 (Del. Super. 2001); *Marsico v. Cole*, 1995 Del. Ch. LEXIS 78, at *12 (Del. Ch.

21

June 30, 1995); *Dickson Medical Group, P.A. v. Foote*, 1984 Del. Ch. LEXIS 429, at *6-7 (Del. Ch. May 10, 1984).

Freedom Care argues that patient information cannot be a trade secret. As set forth above, this is an issue of fact for the jury to determine. Before PCM assigned its nurses to care for patients, the nurses know nothing of the patient's diagnoses, clinical history, treatment regimen, dose and frequency of his medications, activities of daily living, support system and interaction with family members, preferences, and risks presented by his home environment. All of that information is gathered through their employment with PCM. Indeed, this is likely why Freedom Care hired away PCM's nurses to care for Patient A, without the need to provide any training or orientation: they already had all of the information needed to provide the care Patient A wanted and to satisfy his preferences. If PCM's nurses' knowledge of Patient A and his preferences were not important, Freedom Care could have hired any nurse, yet Freedom Care did not do so.

While some patient-client information is without question known by the patient, so too is any client information a company collects and maintains about its customer base. That the client may know or have access to the information collected and maintained by the business does not mean that client information cannot qualify as a trade secret. People do not routinely share their medical records or information with others. Notably, even though Ms. Williams arguably had access to information about Patient A, it did not mean that she could provide care for him. FC Mot. p. 13, ¶39. Further, PCM is required to take "reasonable" measures to protect against the disclosure of its trade secrets outside the organization. *Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. Ct. App. 1990). It is not required to keep medical records and information "secured by a lock," as Freedom Care suggests. FC Mot. p. 27.

Because Freedom Care failed to challenge an independent basis for upholding PCM's contracts with its nurses or, alternatively, because disputed factual issues exist as to the enforceability of such agreements, summary judgment as to this claim is improper.

**B.      Freedom Care damaged PCM through its actions.**

As set forth above, Freedom Care damaged PCM through its conduct.  Freedom Care specifically poached PCM's nurses who had been providing care to Patient A.  It did so for a reason: to make Patient A comfortable with switching providers and to ensure it could provide the same level of care that PCM had provided.  Thus, PCM's claim for tortious inducement to breach must survive summary judgment.

**IV.     PCM HAS SUFFERED AN ASCERTAINABLE LOSS, WHICH IS SUFFICIENT TO SUPPORT ITS CONSUMER PROTECTION ACT CLAIM.**

Freedom Care acknowledges that whether a specific advertisement is deceptive is a question of fact.  FC Mot. p. 29.  Yet Freedom Care claims it is entitled to summary judgment as to PCM's TCPA claim (third claim for relief), arguing that PCM has, as a matter of law, not suffered any damages as a result of Freedom Care's actions.  FC Mot. p. 29.

As set forth in PCM's Motion for Partial Summary Judgment, PCM need only show that it has suffered an "ascertainable loss" to support its TCPA claim, and it has met this burden. Tenn. Code Ann. § 47-18-109(a)(1); *Waggoner Motors, Inc.*, 159 S.W.3d at 58.  Yet Freedom Care claims that PCM cannot tie any of its losses to Freedom Care's advertisements, relying exclusively on the testimony of Cass Ohnstad, in which she stated she was unaware of whether Freedom Care's advertisements caused Patients A or B to begin receiving care by Freedom Care. FC Mot. p. 29.  In doing so, Freedom Care ignores Charlotte Williams's prior statement and her affidavit, in which she states that she learned of Freedom Care from "Freedom Care advertisements."   Williams Aff. (FC. Mot.) p. 3, ¶10; **Ex. 13** (Williams statement); **Ex. 14**.

Moreover, the TCPA is not limited to "advertisements," but instead it prohibits *any* "unfair or deceptive act or practice." Tenn. Code Ann. § 47-18-109(a)(1). Such actions would include holding oneself out as a home care operation, without the appropriate licensure or Certificate of Need. PCM Mot. pp. 16-17. Consequently, Freedom Care's argument with respect to PCM's Consumer Protection Act claim must fail.

## V.    FREEDOM CARE ENGAGED IN UNFAIR COMPETITION THROUGH ITS TORTIOUS CONDUCT, WHICH DAMAGED PCM.

Lastly, Freedom Care argues that PCM's unfair competition claim (fourth claim for relief) must fail because Freedom Care did not engage in any tortious conduct and it did not damage PCM. As explained above, Freedom Care has engaged in tortious interference with existing and/or prospective business relations, it has tortiously induced PCM employees to breach their agreements with PCM, and it has violated the TCPA. *Trau-Med*, 71 S.W.3d at 701, n.5 (elements of unfair competition include tortious or other improper conduct). Such conduct has caused real and compensable harm to PCM. Thus, Freedom Care is not entitled to summary judgment with respect to PCM's unfair competition claim.

## VI.    PCM CONSENTS TO THE ENTRY OF A PERMANENT INJUNCTION WITH RESPECT TO TENN. CODE ANN. § 68-11-229.

In its Motion, Freedom Care states that it "will agree to the entry of a permanent injunction that prohibits it from engaging in any future conduct that violates Tenn. Code Ann. § 68-11-229, provided the rest of the case is resolved as part of this dispositive motion." FC Mot. p. 31. PCM would consent to the entry of such an injunction, though it need not be conditioned on the resolution of the remainder of this case. In any event, disputed issues of fact exist as to how Freedom Care established its relationship with Patients A and B. For those reasons, summary judgment as to this remaining claim is not warranted. However, if Freedom Care consents to the entry of permanent injunctive relief, the claim can be resolved on that basis.

24

## CONCLUSION

Freedom Care built its operations by evading the rules, by wrongfully inducing PCM's nurses to breach their agreements with PCM, and by stealing PCM's patients. Its actions were improper, and with the exception of those portions of PCM's claims that can be decided as a matter of law in favor of PCM, a jury should have an opportunity to hear the facts and render a decision in this case.

WHEREFORE, Plaintiff respectfully requests that the Court deny Freedom Care's Motion for Summary Judgment.

Dated September 9, 2013

Respectfully submitted,

*s/Mark B. Wiletsky*
Mark B. Wiletsky (CO Bar #28893)
Nadya C. Bosch (CO Bar #40348)
HOLLAND & HART LLP
One Boulder Plaza
1800 Broadway, Suite 300
Boulder, CO 80302
Phone: 303-473-2864
Fax: 303-975-5292
mbwiletsky@hollandhart.com
ncbosh@hollandhart.com

Jessica Sievert, BPR #30905
WALLER LANSDEN DORTCH & DAVIS, LLP
Nashville City Center,
511 Union Street, Suite 2700
Nashville, TN 37219-8966
Phone: 615-244-6380
Fax: 615-244-6804
Jessica.sievert@wallerlaw.com

**Attorneys for Plaintiff ACT for Health, Inc.,**
**d/b/a Professional Case Management**

## CERTIFICATE OF SERVICE

I hereby certify that on 9/9/2013, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notification of such filing to the following e-mail addresses indicated on the filing receipt:

Warren L. Gooch
John E. Winters
800 S. Gay Street, Suite 2500
Knoxville, TN 37929
wlgooch@kramer-rayson.com
jwinters@kramer-rayson.com

*s/Thelma Hall*
Thelma Hall

6353922_4

| | | |
|---|---|---|
| ACT FOR HEALTH d/b/a | ) | |
| PROFESSIONAL CASE MANAGEMENT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:12-cv-00442 |
| | ) | Judge Varlan |
| vs. | ) | Magistrate Judge Guyton |
| | ) | |
| CASE MANAGEMENT ASSOCIATES, INC. d/b/a | ) | |
| FREEDOM CARE, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S INDEX OF EXHIBITS TO PLAINTIFF'S RESPONSE TO FREEDOM CARE'S MOTION FOR SUMMARY JUDGMENT

| Ex #. | Description |
|---|---|
| 1 | Cassandra Ohnstad Affidavit – FILED UNDER SEAL |
| 2 | Amanda Stinnett Confidentiality and Non-solicitation Agreement |
| 3 | Dee Garner Deposition excerpts |
| 4 | Case management Associates LLC formation document |
| 5 | Pam Hamman Deposition excerpts |
| 6 | Erik Wangsness 08/02/11 Email |
| 7 | Sandra Davis Affidavit – FILED UNDER SEAL |
| 8 | Amanda Stinnett 11/30/11 email |
| 9 | Freedom Care-Amanda Stinnett business card |
| 10 | Robbins Invoices |
| 11 | Greg Austin Deposition excerpts |
| 12 | Cassandra Ohnstad Deposition excerpts |
| 13 | Charlotte Williams 02/20/13 Letter |
| 14 | Erik Wangsness 03/09/12 Email |
| 15 | Freedom Care Referral chart |
| 16 | William Villegas 01/24/12 Email |
| 17 | Pam Hamman 11/02/11 Email |